UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BETH PATTERSON,

Plaintiff,

v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

Defendant.
_____

DECISION & ORDER

14-CV-6224P

## PRELIMINARY STATEMENT

Plaintiff Beth Patterson ("Patterson") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 3).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 9). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Patterson's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.     Procedural Background

Patterson protectively filed for SSI/DIB on February 1, 2011, alleging disability beginning on December 31, 2010, as a result of anxiety, depression, a learning disability and asthma  (Tr. 176, 200).[1]  On May 11, 2011, the Social Security Administration denied both of Patterson's claims for benefits, finding that she was not disabled.[2]  (Tr. 74-75).  Patterson requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 33, 95-96, 107).  The ALJ conducted a hearing on May 7, 2012.  (Tr. 33-73). Patterson was represented at the hearing by her attorney, Justin Goldstein, Esq.  (Tr. 33, 132).  In a decision dated July 25, 2012, the ALJ found that Patterson was not disabled and was not entitled to benefits.  (Tr. 18-28).

On March 13, 2014, the Appeals Council denied Patterson's request for review of the ALJ's decision.  (Tr. 1-4).  In the denial, the Appeals Council noted that the ALJ's decision contained two typographical errors.  (Tr. 2).  First, the Appeals Council stated that although the decision indicated that Patterson met the disability insured status requirements through December 31, 2015, she actually met the requirements through December 31, 2016.  (*Id.*). Additionally, the Appeals Council noted that although the ALJ's decision stated that no records were received after the hearing, the record made clear that additional records were submitted after the hearing.  (*Id.*).  The Appeals Council cited pages of the ALJ's decision which referenced the additional materials.  (*Id.*).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Patterson previously applied for and was denied benefits in a decision dated September 5, 2008. (Tr. 177).

## II.   Relevant Medical Evidence[3]

### A.   Treatment Records

#### 1.   Unity Internal Medicine

Treatment notes indicate that Patterson attended an appointment with Thomas Pastor ("Pastor"), MD, on January 27, 2011.  (Tr. 379-81).  She complained of worsening depression, stress, difficulty sleeping and feeling overwhelmed.  (*Id.*).  According to the treatment notes, Patterson had previously received therapy at the Evelyn Brandon location of Unity Mental Health ("Evelyn Brandon").  (*Id.*).  Pastor prescribed citalopram and Wellbutrin and referred Patterson to Evelyn Brandon to resume treatment.  (*Id.*).

#### 2.   Evelyn Brandon

Treatment records indicate that Patterson attended a mental health evaluation at Evelyn Brandon on March 17, 2011.  (Tr. 441-53).  Patterson was referred for treatment by her primary care physician, who had prescribed her bupropion and citalopram.  (*Id.*).  According to the treatment notes, Patterson had previously completed the intake process at Evelyn Brandon in 2010, but had failed to attend psychotherapy sessions.  (*Id.*).  Patterson reported that her failure to attend treatment was due to her work schedule.  (*Id.*).

Patterson reported that she had experienced depression for the previous six years. (*Id.*).  She attributed her depression to her learning disability and her inability to attend college. (*Id.*).  She stated that she had been working full-time as a housekeeper, but was currently working only weekends due to her depression.  (*Id.*).  Patterson reported that she had a nine-year-old son and that she enjoyed going to the gym and to the movies.  (*Id.*).  Patterson appeared in appropriate attire and exhibited normal speech, logical and coherent thought form, normal perception, depressed mood, constricted and depressed affect and good insight and

---

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

judgment. (*Id.*). She was diagnosed with major depressive disorder, recurrent, moderate, and a learning disability. (*Id.*). She was assessed a Global Assessment of Functioning ("GAF") 58 and was referred for treatment with a licensed clinical social worker. (*Id.*).

Patterson attended two therapy sessions with Wanda Ewer ("Ewer"), LMSW, in March and May 2011. (Tr. 419-26, 429-35). During those sessions, Patterson reported that the catalyst of her depression was her relationship with her husband. (*Id.*). According to Patterson, she had decided to divorce him. (*Id.*). Patterson reported that she did not have any friends or family to support her emotionally during the divorce proceedings. (*Id.*). Patterson's goals included returning to full-time work. (*Id.*). According to Patterson, she was currently unable to work on a full-time basis due to her depression and ongoing divorce and because she was raising her child alone. (*Id.*). Patterson was discharged from treatment on August 15, 2011 for failing to attend her therapy appointments. (Tr. 401-07).

### 3.       University of Rochester Medical Center – Highland Family Medicine

Treatment notes indicate that on March 6, 2012, Patterson began primary care treatment with Deborah Pierce ("Pierce"), MD. (Tr. 455-56). Patterson complained of depression and explained that she had previously received treatment at Evelyn Brandon. (*Id.*). According to Patterson, she was unable to work due to depression and was having difficulty sleeping. (*Id.*). Pierce prescribed a trial of Fluoxetine and referred Patterson to Behavioral Health Services. (*Id.*).

Patterson attended a follow-up visit with Pierce on March 27, 2012 and reported that the Fluoxetine had slightly improved her mood, although she had experienced one day with a low mood and suicidal ideation. (Tr. 468-69). Patterson reported that she had not yet commenced counseling. (*Id.*). Patterson returned for a visit on April 26, 2012. (Tr. 470-71).

She reported that she had scheduled an appointment for treatment at Evelyn Brandon and that she was working part-time, although she had many absences due to depression. (*Id.*). Pierce prescribed a trial bupropion augmentation. (*Id.*).

**B.    Medical Opinion Evidence**

### 1.    Christine Jean-Jacques, PhD

On April 29, 2011, state examiner Christine Jean-Jacques ("Jean-Jacques"), PhD, conducted a consultative psychiatric evaluation of Patterson. (Tr. 341-45). Patterson reported that she took a bus to the examination. (*Id.*). Patterson also reported that she was separated from her husband and that she lives with her nine-year-old son. (*Id.*). She completed high school and had received special education services due to her difficulties with reading, comprehension and writing. (*Id.*). Patterson was currently employed part-time as a housekeeper, a position she had held since December 30, 2010. (*Id.*). She reported previous employment as a cashier. (*Id.*).

According to Patterson, she had never been hospitalized for psychiatric reasons and she was receiving therapy at Evelyn Brandon. (*Id.*). At the time of the evaluation, Patterson had attended one therapy session with Ewer. (*Id.*). Patterson reported waking during the night and experiencing increased appetite. (*Id.*). She complained of depression, indicated by dysphoric mood, crying spells, guilt, hopelessness, loss of usual interests, irritability, recurrent thoughts of suicide, loss of energy, feelings of worthlessness, diminished self-esteem, difficulties concentrating and social withdrawal. (*Id.*). Patterson had recently lost many of her friends and had been sleeping during the day. (*Id.*). According to Patterson, her feelings of worthlessness stemmed from her difficulties with reading and writing. (*Id.*). Due to her depression, Patterson had been increasingly absent from work. (*Id.*).

Patterson also complained of anxiety, indicated by excessive apprehension, fatigue, irritability, restlessness, difficulty concentrating and headaches. (*Id.*). Patterson reported that she frequently worries about paying her bills and about the effect her learning difficulties have on her life. (*Id.*). Patterson also suffered from symptoms of panic, including sweating and chest pains, triggered by frustration. (*Id.*). Patterson also reported experiencing visual hallucinations. (*Id.*). Collectively, Patterson's mental impairments caused short-term memory deficits and difficulty concentrating. (*Id.*).

Patterson reported that she did not have difficulties cooking, cleaning, doing laundry, shopping or caring for her personal hygiene on a day-to-day basis. (*Id.*). She reported difficulties assisting her son with his homework. (*Id.*). According to Patterson, she interacts with her son and members of her family, but did not report other hobbies or interests. (*Id.*).

Upon examination, Jean-Jacques noted that Patterson appeared appropriately dressed and casually groomed. (*Id.*). Jean-Jacques opined that Patterson had fluent and clear speech with adequate language, coherent and goal-directed thought processes, depressed affect, neutral mood, clear sensorium, full orientation, good insight, good judgment and average intellectual functioning with a general fund of information that was appropriate to experience. (*Id.*). Jean-Jacques noted that Patterson's attention and concentration were intact. (*Id.*). According to Jean-Jacques, Patterson was directed to engage in serial threes, but engaged in serial fours instead, making one error. (*Id.*). Patterson's memory skills were mildly impaired likely due to psychiatric disturbance. (*Id.*). According to Jean-Jacques, Patterson could recall three objects immediately, but could not recall the objects after a delay and did not benefit from cueing. (*Id.*). Further, Patterson was unable to repeat digits. (*Id.*).

According to Jean-Jacques, Patterson could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, relate adequately with others and appropriately deal with stress. (*Id.*). Jean-Jacques opined that Patterson's ability to learn new tasks and perform complex tasks independently might be negatively affected by her difficulties reading. (*Id.*). According to Jean-Jacques, Patterson appeared to suffer from psychiatric problems that might significantly interfere with her ability to function on a daily basis. (*Id.*). Jean-Jacques opined that Patterson's prognosis was good because she was engaged in outpatient mental health treatment. (*Id.*).

## 2. **T. Harding, Psychology**

On May 9, 2011, agency medical consultant T. Harding ("Harding"), MD, completed a Psychiatric Review Technique. (Tr. 351-68). Harding concluded that Patterson's mental impairments did not meet or equal a listed impairment. (Tr. 351, 354, 356). According to Harding, Patterson suffered from mild limitations in her activities of daily living and moderate limitations in her ability to maintain social functioning and concentration, persistence or pace. (Tr. 366). According to Harding, Patterson had not suffered from repeated episodes of deterioration. (*Id.*). Harding completed a mental Residual Functional Capacity ("RFC") assessment. (Tr. 365-68). Harding opined that Patterson suffered from moderate limitations in her ability to remember locations and work-like procedures, understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, accept instructions and respond appropriately to criticism from supervisors, and set realistic

goals or make plans independently of others. (*Id.*). Harding opined that Patterson retained the ability to perform entry-level, unskilled work on a sustained basis. (*Id.*).

## III.    Non-Medical Evidence

### A.    School Records

School records indicate that Patterson repeated kindergarten. (Tr. 235). She was placed into a special education classroom in the third grade after her second grade teacher referred her due to a learning disability. (*Id.*). Patterson was placed into a 15:1 classroom, where she remained throughout the remainder of grade school. (*Id.*).

Joyce Horstman ("Horstman") conducted a psychological evaluation of Patterson on December 11, 2000, when Patterson was in the eleventh grade. (Tr. 235-39). Horstman reviewed Patterson's educational records, including previous intelligence testing. (*Id.*). In 1992, Patterson's verbal intelligence scores were 66, her performance scores were 73, and her full-scale intelligence quotient was 69. (*Id.*). In 1995, Patterson demonstrated low-average verbal scores, mentally deficient performance scores and borderline full-scale intelligence quotient. (*Id.*).

Horstman administered the Kaufman Brief Intelligence Test ("K-BIT") to Patterson. (*Id.*). During the testing, Horstman noted that Patterson was slow to process information and needed to have information repeated, rephrased or simplified to aid her comprehension. (*Id.*). Patterson demonstrated vocabulary scores of 71, matrices scores of 82 and a composite score of 74. (*Id.*). Horstman also administered the Wechsler Individual Achievement Test. (*Id.*). Patterson's scores demonstrated that her reading and writing skills were at a mid-third grade level and her math skills were at a high-fourth grade level. (*Id.*).

According to Horstman, Patterson's nonverbal skills were in the low average range and her verbal skills were below average. (*Id.*). Horstman recommended that Patterson remain classified as learning disabled and continue to be placed in a 15:1 program. (*Id.*).

**B.     Application for Benefits**

In her application for benefits, Patterson reported that she had been born in 1983. (Tr. 176). According to Patterson, she had previously been employed as a cashier and a housekeeper. (Tr. 179-98).

Patterson reported that she lived in an apartment with her son and cat, both of whom she cared for daily without assistance. (*Id.*). She was able to care for her own personal hygiene, but has difficulty sleeping and needs assistance to remember to take her medication. (*Id.*). Patterson was able to prepare her own meals daily and could perform household chores, without assistance, including cleaning, laundry and planting flowers. (*Id.*). Patterson reported that she needs assistance to mow her lawn and complete household repairs. (*Id.*). She did not leave her house often, but was able to walk and use public transportation. (*Id.*). Patterson does not have a driver's license. (*Id.*). Patterson reported that she went shopping once a week for approximately one hour and was able to handle her own finances. (*Id.*).

According to Patterson, she enjoyed watching television and sometimes talked to people on the phone. (*Id.*). She reported going to the gym approximately four times a week in order to clear her mind. (*Id.*). She reported no problems getting along with others, but stated that she had decreased the frequency with which she left her house. (*Id.*). She reported difficulties maintaining attention, completing tasks and following written or spoken instructions. (*Id.*). She also reported difficulties with her memory, particularly when stressed. (*Id.*).

Patterson reported that she experienced sweating, confusion and crying spells when overwhelmed. (*Id.*). According to Patterson, she experienced these symptoms weekly, although she sometimes experienced them daily. (*Id.*). Patterson reported that talking to people helped relieve her symptoms, which typically lasted one hour. (*Id.*). During these episodes, she was unable to travel or complete tasks such as shopping or driving. (*Id.*).

### C. Administrative Hearing Testimony

During the administrative hearing, Patterson testified that she had completed the twelfth grade and had received an IEP diploma. (Tr. 39). She testified that she was going through divorce proceedings and lived with her ten-year-old son. (Tr. 40). Patterson's uncle came to her house to assist her in caring for her son when she was depressed. (Tr. 57). She was typically able to grocery shop, clean her house and prepare meals, although she had difficulty completing these tasks when depressed. (Tr. 58, 66).

Patterson testified that she was currently working approximately twenty-hours a week at a nursing home. (Tr. 40). According to Patterson, she worked approximately three days a week for approximately eight hours per day. (Tr. 40-41). She had been employed by the nursing home since 2010. (Tr. 42). Patterson had missed some days of work due to her depression. (*Id.*). At the nursing home, Patterson spent one day a week performing cleaning duties. (Tr. 44). The other two days she worked as a dietary aide. (*Id.*). According to Patterson, her responsibilities included making drinks for residents, working on a tray line or washing dishes. (*Id.*). Patterson testified that she missed approximately five days of work the previous month. (Tr. 58).

During the approximately first four months that she worked at the nursing home, Patterson also worked at a hospital. (Tr. 43). Patterson testified that she worked at the hospital

beginning in 2008 until December 2010.  (Tr. 43-45).  Patterson testified that her job at the

hospital ended due to her absences caused by her depression.  (*Id.*).  According to Patterson, her

duties included cleaning tasks.  (*Id.*).  Initially, Patterson was employed part-time, but she

increased to full-time employment in order to pay her bills.  (*Id.*).  According to Patterson, she

worked on a full-time basis for approximately one year.  (Tr. 46-47).  Patterson also worked at a

company called Janitronics for less than one year, performing cleaning tasks.  (Tr. 46, 48).

Patterson also worked previously as a cashier at Walmart for approximately three

or four years.  (Tr. 49-50).  Her main responsibility was to check out customers.  (*Id.*).

According to Patterson, she was able to perform this job and to give customers correct change,

although sometimes she needed assistance.  (*Id.*).  Patterson left this job due to her depression.

(Tr. 53).  Patterson also worked at McDonald's in high school.  (Tr. 50).  According to Patterson,

she was unable to complete job applications without assistance.  (Tr. 53).

Patterson testified that she did not have a driver's license because she had failed

the permit test twice.  (Tr. 47).  She also testified that her depression made it difficult to be

around other people.  (Tr. 54).  Patterson testified that she experiences a racing heart, sweating

and frustration.  (Tr. 55).  She also experiences anger, which she attempts to manage by

withdrawing from people.  (Tr. 57).  Patterson also has difficulty sleeping, which causes her to

be drowsy during the day.  (Tr. 60).

Patterson received treatment from Pastor for these symptoms and also received

treatment at Evelyn Brandon.  (Tr. 55-56).  According to Patterson, she was discharged from

treatment at Evelyn Brandon due to missed appointments and had recently recommenced the

intake process.  (Tr. 56).  Her symptoms are alleviated by walking around or going outside.

(Tr. 59).  She also takes medication for her depression, which has helped "[j]ust a little bit" with her anger.  (*Id.*).

Dr. Mancy ("Mancy"), a vocational expert, also testified during the hearing.  (Tr. 67-72).  The ALJ asked Mancy whether Patterson could be characterized as a younger individual with a high school education.  (Tr. 68).  Mancy responded that because Patterson had received an IEP diploma, he considered Patterson's education to be limited.  (*Id.*).  The ALJ asked Mancy to characterize Patterson's previous employment.  (Tr. 69).  According to Mancy, Patterson previously had been employed as a fast food worker (Dictionary of Occupational Titles ("DOT") 311.477-010), a cleaner/housekeeping (DOT 323.687-010), cleaner/hospital (DOT 323.687-010), dietary aide (DOT 319.677-014) and a cashier or wrapper (DOT 211.462-018).  (*Id.*).

The ALJ asked Mancy whether a person would be able to perform Patterson's previous jobs who was the same age as Patterson, with the same education and vocational profile, and who was able to perform the full range of work at all exertional levels, but who was limited to simple tasks and occasional interaction with coworkers and the general public.  (Tr. 69-70).  Mancy testified that such an individual would be able to perform the previously-identified jobs of cleaner/housekeeping, cleaner/hospital and dietary aide.  (Tr. 70).  The ALJ then asked Mancy whether any other jobs would exist for the same individual with the same limitations.  (*Id.*).  Mancy opined that such an individual could perform the jobs of hand packager (DOT 920.587-018) and laundry worker II (DOT 361.685-018).  (*Id.*).

The ALJ then asked Mancy whether a person would be able to perform Patterson's previous jobs who was the same age as Patterson, with the same education and vocational profile, and who was able to perform the full range of work at all exertional levels,

but who was limited to simple tasks and who must primarily work alone with only occasional supervision. (Tr. 70-71). Mancy opined that such an individual could perform the previously-identified jobs of cleaning/housekeeping and cleaning/hospital. (Tr. 71). Mancy also opined that such an individual could perform the jobs of hand packager and collator operator (DOT 208.685-010).

The ALJ then asked Mancy whether jobs would exist for the same individual with the same limitations, except that the individual would be off-task approximately twenty percent or more of the workday. (Tr. 98). Mancy opined that such an individual would not be able to maintain full-time competitive employment. (*Id.*).

## DISCUSSION

### I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1)      whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment"
        that "significantly limits [the claimant's] physical or mental
        ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments
        meets or equals one of the impairments listed in Appendix
        1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments,
        the claimant retains the residual functional capacity to
        perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.     The ALJ's Decision

        In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 15-28).  Under step one of the process, the ALJ found that Patterson had

not engaged in substantial gainful activity since December 31, 2010, the alleged onset date.

(Tr. 20).  The ALJ noted, however, that Patterson had worked since the alleged onset date at

levels that were just below the substantial gainful activity level for 2011.  (*Id.*).  At step two, the

ALJ concluded that Patterson has the severe impairments of borderline intellectual functioning,

depression and anxiety.  (Tr. 21).  The ALJ determined that Patterson's asthma was non-severe.

(*Id.*).  With respect to Patterson's mental impairments, the ALJ found that Patterson suffered

from no restrictions in activities of daily living and moderate difficulties in maintaining

concentration, persistence and pace and social functioning. (Tr. 21-22). At step three, the ALJ determined that Patterson does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Tr. 21-23). The ALJ concluded that Patterson has the RFC to perform the full range of work at all exertional levels, but that she was limited to work involving simple tasks and occasional interaction with coworkers and the general public. (Tr. 23). At step four, the ALJ determined that Patterson was able to perform her previous work as a cleaner/housekeeping and a cleaner/hospital. (Tr. 26-27). Finally, the ALJ proceeded to step five and determined that other jobs existed in the national economy that Patterson could perform, including the positions of hand packager and laundry worker. (Tr. 27). Accordingly, the ALJ found that Patterson was not disabled. (*Id.*).

**B.     Patterson's Contentions**

Patterson contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error. (Docket # 8-1). First, Patterson maintains that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to account for limitations assessed by Jean-Jacques and Harding. (*Id.* at 12-16). Next, Patterson maintains that the ALJ failed to consider her intelligence deficits when formulating the RFC. (*Id.* at 16).

Patterson also contends that the ALJ failed to apply the correct legal standards when evaluating her credibility. (*Id.* at 17). First, Patterson maintains that the ALJ improperly compared her credibility to his own RFC assessment. (*Id.*). Next, Patterson maintains that the ALJ failed to discuss information contained in her education and medical records when conducting his credibility assessment. (*Id.* at 18-19, 21-23). Finally, Patterson maintains that the

ALJ mischaracterized her work history and her activities of daily living when evaluating her credibility. (*Id.* at 19-20).

With respect to the ALJ's step four and five findings, Patterson maintains that the vocational expert's testimony cannot provide substantial evidence because it was based upon a flawed RFC assessment. (*Id.* at 24). Next, Patterson maintains that the ALJ's conclusion that Patterson could perform her previous employment as a cleaner/housekeeping was flawed because there was insufficient evidence in the record to establish that Patterson performed that job at a level of substantial gainful activity. (*Id.* at 26-27). With respect to the remaining positions identified at step four and five, Patterson maintains that they all required a reasoning level of 2, which was inconsistent with the ALJ's conclusion that Patterson could perform only simple work. (*Id.* at 27-29).

## II.     Analysis

### A.     Mental RFC Assessment

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*,

2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380

F. App'x 231 (2d Cir. 2010).

I turn first to Patterson's contention that the ALJ failed to account for limitations assessed by Jean-Jacques and Harding.  (Docket ## 8-1 at 12-16; 10 at 1-4).  Specifically, Patterson maintains that the ALJ's RFC assessment fails to account for Jean-Jacques's opinion that Patterson suffered from some limitations in her ability to learn new tasks.  (*Id.*).  Additionally, Patterson contends that the ALJ ignored Jean-Jacques's conclusion that Patterson appeared to suffer from psychiatric problems that might significantly interfere with her ability to function on a day-to-day basis.  (*Id.*).  Patterson also maintains that the ALJ failed to account for the moderate limitations assessed by Harding, which included limitations in Patterson's ability to remember locations and work-like procedures, understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals, and make plans independently of others.  (*Id.*).  Patterson maintains that despite giving considerable weight to Jean-Jacques's opinion and "some weight" to Harding's opinion, the ALJ overlooked their opinions that Patterson suffered from mental limitations that would preclude her ability to work.  (*Id.*).

I disagree.  Although both Jean-Jacques and Harding acknowledged that Patterson had mental limitations in certain categories of mental work-related functions, both concluded that Patterson was capable of understanding simple directions and performing simple tasks independently.  (Tr. 344, 367).  For instance, despite the limitations assessed by Harding, he opined that Patterson retained the ability "to perform entry-level, unskilled work on a sustained

basis." (Tr. 367). Similarly, although Jean-Jacques stated that Patterson's ability to learn new tasks may be negatively affected by her reading difficulties, Jean-Jacques also determined that, despite those limitations, Patterson retained the ability to understand and follow simple directions, perform simple tasks, maintain attention and concentration, maintain a schedule, make appropriate decisions, relate adequately with others, and adequately deal with stress. (Tr. 344). These conclusions are consistent with the ALJ's conclusion that Patterson was able to perform the basic mental demands of unskilled work. SSR 85-15, 1985 WL 56857, *4 (1985) ("[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers and usual work situations, and to deal with changes in a routine work setting"). Similarly, Jean-Jacques's conclusion that Patterson's psychiatric problems might significantly interfere with her ability to function on a daily basis is not inconsistent with the ALJ's conclusion that Patterson could perform simple work tasks. This is particularly true when viewed in the context of Jean-Jacques's entire opinion, which, as discussed above, essentially concluded that Patterson retained the ability to perform the basic mental demands of unskilled work. *See Taylor v. Comm'r of Soc. Sec.*, 2015 WL 4649820, *5 (N.D.N.Y. 2015) (ALJ properly relied upon and considered consulting psychiatrist's opinion in determining that claimant's mental impairments were not severe; although psychiatrist opined that impairments could significantly interfere with daily functioning, psychiatrist also concluded that claimant "possessed requisite mental capacity for basic work activities"); *Williams v. Colvin*, 2014 WL 4146191, *9 (N.D.N.Y. 2014) (plaintiff's reliance on consultant's opinion that his psychiatric problems may significantly interfere with his daily functioning was misplaced where psychiatrist also concluded that plaintiff had no mental functioning limitations and plaintiff took

the statement about daily functioning out of context); *Cross v. Astrue*, 2009 WL 3790177, *6-7 (N.D.N.Y. 2009) (ALJ did not ignore consultant's opinion that claimant's mental impairments may significantly interfere with daily functioning where ALJ considered specific limitations assessed by consultant and where there was "little in [the] report to suggest [p]laintiff's psychological symptoms were so debilitating that she could not engage in any substantial gainful activity"). I find that the ALJ's RFC assessment accounted for the limitations assessed by Jean-Jacques's and Harding's opinions and was entirely consistent with their opinions that Patterson could perform unskilled work. Accordingly, I conclude that the ALJ properly evaluated and incorporated into his RFC assessment the limitations identified in the medical opinions, even if he did not explicitly discuss each limitation. *See Retana v. Astrue*, 2012 WL 1079229, *6 (D. Colo. 2012) (ALJ was not required to thoroughly discuss each moderate limitation; "ALJ's RFC adopted some of [doctor's] moderate limitations such as restricting plaintiff to unskilled work not involving complex tasks, reflecting plaintiff's moderate limitations in his ability to carry out detailed instruction and to maintain concentration for extended periods"); *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) ("despite granting little weight to [the doctor's] opinions, [the ALJ] accounted for [p]laintiff's difficulties with concentration and stress in his RFC[;] [t]herefore, had the ALJ opted to grant [the doctor] a greater weight, it would not have affected his RFC").

    I likewise reject Patterson's remaining challenges to the ALJ's mental RFC assessment. (Docket ## 8-1 at 16; 10 at 5-6). A review of the ALJ's decision demonstrates that he considered Patterson's intellectual functioning when assessing her RFC. During the step two and three analysis, the ALJ discussed Patterson's intellectual functioning at length, including discussing her education records and results of various intelligence testing. (Tr. 21). The ALJ

acknowledged that Patterson's IQ scores varied between low average to deficient, but noted that Patterson had exhibited an ability to maintain full-time employment without special accommodations, despite her limited intellectual functioning. (*Id.*). Similarly, when assessing her RFC, the ALJ noted that Patterson was able to complete various activities of daily living and had maintained several jobs, including a semi-skilled job without special accommodations. (Tr. 24). Although Jean-Jacques did not administer intelligence testing, as noted by the ALJ, she examined Patterson and did not observe any evidence of a cognitive deficit, and indeed opined that her intellectual functioning was average and that she had a general fund of information appropriate to her experience. (*Id.*).

I disagree with Patterson that the ALJ's discussion implicitly "rejects" Patterson's level of intellectual functioning or that he failed to evaluate her test scores and education records. (Docket # 8-1 at 16). The ALJ accurately described the varying results of Patterson's cognitive testing and compared those results with her daily functioning, work history and Jean-Jacques's observations of her cognitive functioning during a face-to-face examination.

Nothing in the record suggests that Patterson is unable to perform unskilled work. Indeed, the record reflects that Patterson was able to perform activities of daily living and maintain employment without accommodations despite her intellectual limitations. Although Patterson testified that she received assistance from her uncle to complete household responsibilities, she reported to her treating physicians and in her application for benefits that she was able to care for herself, her son and her household without assistance. Similarly, although Patterson reported work-attendance difficulties due to her depression, Jean-Jacques concluded that Patterson would be able to maintain a regular schedule. I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial

record evidence; accordingly, remand is not warranted. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

Patterson argues for the first time in her reply papers that the ALJ erred because he failed to seek a medical opinion from her treating physicians. (Docket # 10 at 4). Patterson also argues for the first time in reply that the ALJ erred by failing to order intelligence testing. (*Id.* at 5). As an initial matter, these arguments appear procedurally barred because Patterson failed to raise them in her opening brief. *See Jones v. Astrue*, 2013 WL 802778, *5 (E.D.N.Y. 2013) (claimant's argument procedurally deficient when not raised in its opening brief) (collecting cases). In any event, I conclude that these alleged errors do not warrant remand.

With respect to the failure to seek an opinion from a treating physician, the "Second Circuit has held that absence of a medical source statement from a treating physician does not require remand 'where the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.'" *Prince v. Colvin*, 2015 WL 1408411, *17 (S.D.N.Y. 2015) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33-34 (2d Cir. 2013)). In the case, it is not clear whether any of Patterson's doctors would qualify as treating sources because the record contains evidence of only one appointment with Pastor, two appointments with Ewer and three appointments with Pierce. *See Wearen v. Colvin*, 2015 WL 1038236, *14 (W.D.N.Y. 2015) ("I disagree with [plaintiff's] characterization of [the doctor] as a treating doctor because the record reflects that [the doctor] only treated [plaintiff] on one occasion before rendering her opinion") (citing *Hamilton v. Astrue*, 2013 WL 5474210, *11

(W.D.N.Y. 2013) ("it is not clear that [the doctor] may be considered a treating physician because [plaintiff] testified that the first time she was examined by [the doctor] was when he completed her disability paperwork") (collecting cases)). In any event, the record contained the treatment notes from Patterson's doctors, as well as assessments by state consultants. Accordingly, I conclude that the record was sufficiently developed to permit the ALJ to assess Patterson's RFC. *See Prince v. Colvin*, 2015 WL 1408411 at *17 (collecting cases).

I further conclude that there was no gap in the record with respect to intelligence testing. As an initial matter, Patterson does not challenge the ALJ's conclusion that she did not meet Listing 12.05, arguing instead that the ALJ failed to consider her intelligence when assessing her RFC and that the ALJ ignored or mischaracterized her testing scores. Patterson contends that the ALJ improperly relied upon her K-BIT scores from 2000 while rejecting her earlier, lower scores from 1992 and 1996. I disagree with Patterson's characterization of the ALJ's decision. As explained above, the ALJ reviewed and explicitly discussed the range of scores that Patterson received on her intelligence testing. (Tr. 21). The ALJ evaluated Patterson's varying intelligence scores in the context of the entire record, including Patterson's ability to independently engage in a wide variety of activities of daily living and her work history, which demonstrated an ability to maintain employment without special accommodations or assistance, and concluded that her level of functioning was consistent with the scores suggesting a borderline level of functioning. *See Rodriguez v. Colvin*, 2014 WL 3882191, *14 (W.D.N.Y. 2014) ("[t]he [c]ourt agrees that [p]laintiff's ability to live independently belies his contention that he has deficits in adaptive functioning"). The ALJ considered this limited functioning when assessing Patterson's RFC. Nothing in the record suggests that additional testing was necessary or would have assisted the ALJ in his analysis. Accordingly, I conclude

23

that the ALJ did not err by failing to order additional intelligence testing. *Daniels v. Astrue*, 2012 WL 1415322, *18 (S.D.N.Y. 2012) (record was complete where ALJ ordered two consultative evaluations and obtained relevant medical records and where plaintiff had a work history as a parking lot cashier, a store cashier and a hairstylist).

**B.      Credibility Assessment**

I turn next to Patterson's contention that the ALJ's credibility analysis is flawed because he applied the incorrect legal standards and failed to support his credibility determination with a complete discussion of the record. (Docket ## 8-1 at 17-23; 10 at 6-8).

An ALJ's credibility assessment should reflect a two-step analysis. *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011). First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom. *Id.* (citing 20 C.F.R. § 404.1529). Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record." *Id.* (citing 20 C.F.R. § 404.1529(c)). The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate [his] pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).

The ALJ concluded that Patterson's statements "concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 24). In doing so, the ALJ assessed Patterson's subjective complaints in the context of a comprehensive review of the entire record. I disagree with Patterson's contention that the ALJ relied only on part of the record in conducting his credibility assessment or that he mischaracterized the evidence.

The ALJ recounted Patterson's reported daily activities and work history. (*Id.*). Significantly, the ALJ noted that despite Patterson's allegations that she is disabled due to a learning disability, Patterson was able to manage her household and maintain employment without special accommodations or assistance. (*Id.*). Patterson maintains that the ALJ mischaracterized the record because Patterson testified that her uncle assisted her at home and that she sometimes used a calculator or requested assistance when working as a cashier. (Docket # 8-1 at 19-20). I disagree. Although Patterson testified that her uncle assisted her at home during periods of depression, she reported in her application and to evaluating doctors that she was able to manage her household and care for her son without assistance. (Tr. 180-82, 344). Similarly, despite her testimony that she sometimes needed assistance when calculating change, she testified that as a general matter she was able to perform her duties as a cashier, and the record does not reflect that she was terminated or left any employment positions due to her cognitive limitations. (Tr. 49-50).

The ALJ also thoroughly reviewed Patterson's medical history, which demonstrated limited treatment for depression and no treatment for anxiety. (Tr. 25). The ALJ also reviewed the consultative opinions provided by Jean-Jacques and Harding, both of whom assessed limitations but ultimately concluded that Patterson was able to sustain simple,

entry-level employment.  (Tr. 25-26).  Patterson maintains that the ALJ failed to fully discuss information contained in her education records.  (Docket ## 8-1 at 18-19; 10 at 7-8).  Yet, as discussed above, the ALJ's decision makes clear that he reviewed and considered her education records when conducting his analysis.  In any event, "an ALJ is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate that it was not considered."  *Adams v. Colvin*, 2014 WL 5529395, *7 (W.D.N.Y. 2014) (internal quotations omitted).

Similarly, Patterson contends that the ALJ failed to consider Pierce's treatment records that were submitted after the hearing.  (Docket # 8-1 at 21-22).  As the government correctly notes, although the ALJ incorrectly indicated at the beginning of his decision that the additional records from Pierce were never received (Tr. 18), the ALJ repeatedly cited to the records in his decision, thus demonstrating that he had reviewed and considered them in rendering his decision (Docket # 9-1 at 21-22 (citing Tr. 25-26)).

After a comprehensive review of the record, the ALJ concluded that Patterson's credibility concerning the severity of her impairments was undermined by several facts.  First, the ALJ determined that Patterson made inconsistent statements regarding the cause of her depression.  (Tr. 25).  Next, the ALJ concluded that Patterson, on the one hand, testified that she frequently stays home, and, on the other hand, told her therapist that she frequently goes to the gym, the movies and walks with her son.  (*Id.*).  Finally, the ALJ noted that Patterson complained of anxiety-related symptoms during her consultative examination, but did not report similar complaints to her treating physicians.  (*Id.*).  I conclude that the ALJ applied the proper legal standards in analyzing Patterson's subjective complaints and that substantial evidence supports the ALJ's determination that Patterson's complaints were "not credible" to the extent they were

inconsistent with the ALJ's RFC assessment. *See Luther v. Colvin*, 2013 WL 3816540, *7 (W.D.N.Y. 2013) (ALJ properly assessed subjective complaints where she "reviewed all of [p]laintiff's subjective complaints . . . [and] properly considered [p]laintiff's activities of daily living, inconsistent testimony and how her symptoms affected her attempts at maintaining a job").

 I also reject Patterson's argument that the ALJ incorrectly found that her statements were not credible solely because they were inconsistent with the ALJ's RFC finding. To the contrary, the ALJ's decision demonstrates that he evaluated Patterson's credibility after carefully reviewing the evidence. *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 318 (W.D.N.Y. 2013) ("[t]his argument has been rejected by a number of courts[;] . . . [t]he ALJ specifically stated that she assessed [claimant's] statements concerning the intensity, persistence and limiting effects of his symptoms after careful consideration of the evidence") (internal quotation omitted) (collecting cases). In sum, I conclude that the ALJ applied the correct legal standard in assessing Patterson's credibility and that his credibility determination is supported by substantial evidence in the record.

 **C.** <u>**Steps Four and Five Assessments**</u>

 I turn next to Patterson's challenge to the ALJ's steps four and five determinations. (Docket ## 8-1 at 24-29; 10 at 8-10). First, Patterson contends that remand is warranted because she did not perform her prior employment as a cleaner/housekeeping at a level that constituted substantial gainful activity under the earnings guidelines and that her job as a cleaner/housekeeping thus cannot be considered "past relevant work." (*Id.*).

 The record suggests that Patterson worked part-time at Janitronics as a cleaner/housekeeping in 2008 and 2009. (Tr. 191). According to regulatory earnings guidelines,

if Patterson's monthly earnings during those years met or exceeded $ 940 and $ 980, respectively, then a rebuttable presumption arises that she was engaged in substantial gainful activity for those years.[4]  *See* 20 C.F.R. §§ 404.1574(b)(2)(i)-(ii); *see also* Social Security Administration Program Operations Manual System ("POMS") DI 10501.015, *available at* *https://secure.ssa.gov/poms.nsf/lnx/0410501015*).  In her application for SSI/DIB, Patterson represented that when she was employed at Janitronics, she worked five days a week for three hours per day at an hourly rate of $ 7.46 per hour.  (Tr. 194).  Based upon this representation, Patterson earned approximately $ 492.36 per month – below the $ 940 to $ 980 monthly earnings set forth in the guidelines for 2008-2009.  I agree with Patterson that the record suggests that she worked as a cleaner/housekeep at a level below the earnings guidelines, but conclude that any error by the ALJ in considering this work as past relevant work was ultimately harmless because the ALJ identified another position at step four and, in any event, the ALJ proceeded to step five. *Johnson v. Astrue*, 2009 WL 1650415, *6 (W.D.N.Y. 2009) (failure to properly examine past relevant work is harmless when ALJ makes a correct ruling at step five).

Patterson argues that any error by the ALJ was not harmless because the remaining positions identified by the ALJ at step four and five required reasoning or language levels that were inconsistent with the ALJ's conclusion that Patterson could only perform simple work.  (Docket ## 8-1 at 27-29; 10 at 9-10).  I disagree.  Patterson correctly notes that the positions of cleaner/hospital, hand packager and launder worker II, each have general educational development ("GED") requirements, including reasoning level 2 and language level of 1 or 2.  *See* DOT 323.687-010, 1991 WL 672782 (2008) (cleaner/hospital); DOT

---

[4]  The guidelines provide that a claimant's earnings beginning in 2001 and each year thereafter ordinarily will show that she engaged in substantial gainful activity if the earnings increased over the previous year or the average monthly earnings were more than $ 700, adjusted for changes in the national wage index.  *See* 20 C.F.R. § 404.1574(b)(2)(i)-(ii).

920.587-018, 1991 WL 687916 (2008) (hand packager); DOT 361.685-018, 1991 WL 672987

(2008) (laundry worker II).  Despite Patterson's arguments to the contrary, courts have routinely

held that an "RFC determination limiting a plaintiff to simple and routine tasks means that a

plaintiff is capable of working at reasoning development level two."  *Prince*, 2015 WL 1408411,

*21 (S.D.N.Y. 2015); *McCusker v. Comm'r of Soc. Sec.*, 2014 WL 6610025, *4 (N.D.N.Y.

2014) ("a number of courts have held that jobs with DOT reasoning levels of two or three are

comparable with limitations to simple and low stress work"); *Rivera v. Colvin*, 2014 WL

3732317, *42 (S.D.N.Y. 2014) ("[m]ost courts, in this circuit and others, have held that an RFC

that limits a claimant to only simple and routine tasks *is* consistent with GED level 2

reasoning"); *Chaffin v. Colvin*, 999 F. Supp. 2d 468, 474-75 (W.D.N.Y. 2014) ("[w]orking at

reasoning level 2 does not contradict a mandate that work be simple, routine and repetitive")

(quoting *Edwards v. Astrue*, 2010 WL 3701776, *15 (N.D.N.Y. 2010)); *Jones-Reid v. Astrue*,

934 F. Supp. 2d 381, 408 (D. Conn. 2012) ("[a] number of courts have found that a limitation of

simple tasks or instructions is consistent with GED level 2 reasoning"), *aff'd*, 515 F. App'x 32

(2d Cir. 2013); *Carrigan v. Astrue*, 2011 WL 4372651, *10 (D. Vt.) ("[t]he weight of the

authority compels a conclusion that, generally, someone like [plaintiff], who is able to perform

simple, repetitive tasks, is capable of performing Reasoning Level 2 jobs") (collecting cases),

*report and recommendation adopted*, 2011 WL 4372494 (D. Vt. 2011).  Significantly, in this

case, Patterson has worked for several years as a cleaner/hospital on both a full-time and

part-time basis.  (Tr. 42-43, 45-46, 195).  Although she contends that she has trouble maintaining

her attendance due to her depression, there is nothing in the record to suggest that she is unable

to perform the job because its responsibilities exceed her reasoning or language capabilities.

Finally, I turn to Patterson's contention that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. (Docket # 8-1 at 25-26). Having determined that substantial evidence supports the ALJ's RFC determination, this argument is rejected. *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 9)** is **GRANTED**. Patterson's motion for judgment on the pleadings **(Docket # 8)** is **DENIED**, and Patterson's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      August 26, 2015